al, and Root, who do we have, Ms. Reitman? Did I get the first one right, your client's name? Agnieszka. Adhikari? Adhikari, yeah. Okay. One out of two. Sorry. May it please the Court. My name is Agnieszka Frischmann. I represent plaintiffs' accounts with my co-counsel, Paul Hoffman. I'll be presenting argument on the trafficking statute and the non-federal claims. Mr. Hoffman will be presenting argument on the alien tort statute. We split the argument in half, eight minutes each, with two minutes each for rebuttal, if that's all right with the Court. I would like to start by highlighting two of the many issues that we briefed in our papers. One is the clarifying amendment, and the second is the land graph. We believe that the trafficking— The second is what now? The land graph issue, your Honor. All right. Just remember to keep your voice up, please. So, as to the clarifying amendment, we believe that the 2008 jurisdictional expansion was well-settled, that Congress may amend a statute to clarify existing law, correct misinterpretation, overrule wrongly decided cases. And that's not in dispute. That's what this Court held—the panel of this Court held in the Wesson case. And the test for whether an amendment is clarifying or not is if it's enacted immediately or promptly thereafter a contrary court decision, and that is exactly what happened here. In 2007, Roe v. Bridgestone was decided, and it was after that decision that the House introduced an amendment to reauthorize the TVPRA and included extraterritorial jurisdiction language. In fact, the original draft of the reauthorization didn't include an extraterritorial jurisdiction provision. It was added after Roe v. Bridgestone. In March 2008, the NADA case was decided by Judge Lamberth in the District of Columbia, and it also held that the statute wasn't extraterritorial, and promptly thereafter in the Senate bill, there was an extraterritorial jurisdiction expansion provision added promptly after that decision. And then in December—too fast? Your argument is not going to be very effective unless we hear it. I'm sorry, Your Honor. I will slow down and speak up. Speak up. Speak up and slow down. Now, in fairness to you, I say that all lawyers talk that fast, but 98 percent of them are female, and I can't explain that, but they just do. And my daughters tell me, Daddy, the reason we talk faster is because some guy is going to come and interrupt us. So I plead guilty to that, but nonetheless— You might be doing that too. Please, please. I want to hear what you say. So what I'm saying is that the legislative history of the dates of the decisions and then the dates of the enactment of the clarifying amendment track exactly the test for what a clarifying amendment is. The House and Senate acted promptly after two contrary decisions, and they acted to clarify the statute extended to extraterritorial jurisdiction. How can we interpret that as a clarification versus an amendment to fix a problem with a decision? The test for clarifying has looked to the timing of the enactments more than it's looked to, like, a textual trigger. So what courts have done is looked to what happened. In fact, in Wesson, the panel of this court said, at the time Congress acted, the court had issued a contrary ruling. The most plausible explanation of the amendment is that the case was wrongly decided and Congress acted to correct it. And that's what we posit is exactly what happened here. And moreover, that correction is consistent with every act taken by the Congress in the last 15 to 20 years to ensure that there is extraterritorial jurisdiction over conduct by U.S. nationals and, in particular, conduct by U.S. military contractors who engage in trafficking overseas. It's consistent with the Patriot Act. It's consistent with the Military Extraterritorial Jurisdiction Act. So this clarification is consistent with every act taken by the Congress for the last 15 years to ensure that our laws cover this type of conduct. But it still extended jurisdiction. Even though it clarified things, didn't it extend jurisdiction before the amendment? There was some limit to where the statute... Where the statute was before? Yes.  ...the conduct that occurred here at this U.S. military base. But there were two contrary court decisions and then the Congress promptly acted to ensure that the statute was read in the way it should be. And one thing that I think it's important to remember is that the statute was enacted was passed well before Morrison and well before any clear statement rule. So the statute had a whole long list of findings and about the impact of trafficking and the importance in the world, you know, the international impact of it and how it happens all over the world and how it's important to cooperate and work overseas. And one would have thought before Morrison that that would have been enough. And it's plain that after Morrison there's an elevated test. But before Morrison, Congress would have thought that those findings were enough. And we think the better view is to think that the statute would have applied. But then once courts found that it wasn't enough, Congress did act quickly and promptly to correct it. And that is the test for a clarifying amendment. And uniform case law test clarifying amendments pose no retroactivity concerns. And the next thing I'd like to discuss and sort of mindful of the time is the Landgraf test. Both parties agree that this case is governed by Landgraf if we reach the retroactivity issue. And both parties agree in KBR's words from their own brief that a functional analysis of the impact of the enactment is required. And the impact is done, the analysis is done on the specific objector. So you look at the impact on KBR Halliburton. And our view is that no matter what label is placed on the statute, whether you say that enactment in 2008 is jurisdictional or substantive, that there is no retroactive effect here under Landgraf. It's the same plaintiffs, the same liability, and the same damages, both before and after the 2008 amendment. And that is the same analysis that the Supreme Court used in Bradley when it looked at the availability of damages under the common law. And the intercited in both Landgraf and Martin v. Haddix, it looked favorably on that Bradley analysis and said the reason that case came out the way it did is because you should look to the common law and see if those same claims were available. So you're saying those claims were available regardless of the statute under Iraqi law or a state tort law that these claims, all these claims were available? Yeah, and it's not just me that says it. The United States Department of Justice, when they sent a letter to the Senate saying you shouldn't enact a federal remedy, and the Congress went ahead and enacted it anyway, said all of these claims are already covered by state tort law. So you're having a double remedy. Are they covered by state law, are they covered by Iraqi law, or a combination thereof? I think — Or could you have gone to file this — could you have gone to Iraqi — to Iraq and — Assuming that Iraqi courts were operative or, you know, functioned that there isn't a war on and anyone could — right? Like, if there's a war on, it's still going on. But I think Arkell v. McGee answers this question. In Arkell, a panel of this court said that the plaintiffs could sue here and use Iraqi law. And it's uncontroverted below — we put in an expert declaration from an expert on Iraqi law and it was uncontroverted — that Iraqi law covers these same wrongs and provides the same measure of damages. So that was uncontroverted below, that under Arkell v. McGee, plaintiffs could have sued here, and looking at choice of law principles, applied Iraqi law and proceeded with their case in the United States. And the same damages? Same damages. KBR has argued in both cases that punitive damages are not available either under the TVPRA or under Iraqi law, and that was never decided by the district court. What about under state tort law? Same damages. In fact, the TVPRA explicitly provides — just says damages, so it's the exact same damages as state tort law by the wording of the statute. And if there are — I also just wanted to ask the Court if there's any questions about Morrison. We briefed it extensively, but if there are questions about that case, I'm happy to address them. We think the Court below misinterpreted Morrison because we think it has no impact on Magrath because whatever type of statute it is, it's the same test that applies. So we think the Court was right the first time when he ruled that we had jurisdiction over these claims. Okay. I'm now figuring it out. See, New Yorkers speak fast, so they can get their argument in within the time allowed. But down here in the South, people talk a little slower, so they can't get their argument in within the time that's allotted. You know, I'm not a jaywalker. When the light goes red, I just stop. I don't know. Thank you, Your Honor. Thank you. May it please the Court, Paul Hoffman for the plaintiffs. And I'm going to address the Alien Tort Statute issues in the case. This is a case that is at the opposite end of the U.S. connection spectrum from Kiobel. Kiobel was a case that involved entirely foreign plaintiffs, entirely foreign defendants, events that took place entirely in Nigeria. And the only connection of the case to the United States was the fact that Shell, the parent companies of Shell, had an investor operation in New York City for the stock exchange. That was the only connection. That was what the Court was dealing with in Kiobel. It was dealing with a case where the United Kingdom and the Netherlands opposed jurisdiction on international law grounds and protested what the courts had done below. In this case, you have a U.S. corporation taking $35 billion from the United States government through a contract paid for by U.S. taxpayers. The contract administered and financed and all the transactions taking place in the United States, or at least a trafficking that we allege, both from the United States in terms of control, decision making, supervision, inaction in the face of consistent reports from a wide variety of sources about ongoing trafficking on the base at al-Assad and other bases in Iraq. And so you have a situation here where all of the connections in the case virtually are to the United States except this is taking place at a U.S. base. In terms of the statute, I start with alien torture. Tell me what the touching concerns are, other than the fact that it was a domestic corporation that's involved, as you described. What's the interest of the United States? What's the interest of the United States? Under that statute. Well, the interest of the United States, as the U.S. military brief, the brief of the admiral says, the United States has had a tremendous interest in preventing trafficking. What about the alien torture statute? Well, the alien torture statute was passed by the founders in 1789 to provide a federal forum for aliens who claim that their rights had been violated under the law of nations. And this is exactly the kind of situation that the founders intended, that they didn't know what the law of nations violations might be in 2004, but they certainly knew that there I understand that, but the reality of our jurisprudence is that the high court has been very resistant to extraterritorial reach of domestic statutes. I think you would agree to that. And as a gentleman, in other words, they required, were you talking about the antitrust laws or whatever, they really have been insistent that they have this impact back here. And I want you to describe to me the requisite connections, in your view, that is what's sufficient under each of these statutes that you sue under. Well, I mean, it's the ATS that I'm dealing with. And I think that the, first of all, in Kiobo, the court was not applying the actual presumption against extraterritoriality. It recognized that the ATS is a jurisdictional statute. It was applying the principles underlying the statute. And the principles underlying don't apply here, because the principles they were talking about, for example, are interference with the U.S. government's management of foreign affairs. Well, the U.S. government has made it absolutely clear what it's doing with respect to trafficking, including on military bases. And it has exclusive jurisdiction and control over Iraq at that point, but in particular the Al-Assad air base. So that principle has absolutely no application here, as it might in an alien tort statute or in a case where a U.S. corporation is being accused of aiding and abetting a foreign government committing human rights violations in its own country. That's not here. To show aiding and abetting, do you have to show that the U.S. corporation knew the purpose of it was alien trafficking or human trafficking and knew that this was taking place? Is that an element of aiding and abetting? You have to know some sort of participation and knowledge in the actual human trafficking? And there's two points. One is, this is unlike many of the other cases that have been cited. This and Al-Shamari are direct liability cases. In other words, KBR actually is responsible for committing trafficking, for obtaining trafficked labor, which is one of the violations of trafficking. So it's not just aiding and abetting somebody else. It's their own violations, which is completely different from virtually every other case that's been cited by the other side, except Al-Shamari, which was also a U.S. contractor, directly liable. But to answer your question specifically on aiding and abetting, the circuits are split. This circuit, I do not believe, has answered the question of what the criteria are. The Eleventh Circuit has applied federal common law, aiding and abetting, Restatement Section 876B, which is a knowledge standard for aiding and abetting. It's providing practical assistance and encouragement that has a substantial effect on the commission of the tort, in that case, or the crime, with knowledge. The Second Circuit has a purpose test, which seems a lot like specific intent, which I would argue is the wrong test. The Ninth Circuit has a purpose test, which is much closer to knowledge and much closer to the international law on the question. Those issues were not litigated below. In other words, we didn't get to that issue, and that's one of the things we've argued about, that we should have been allowed to get to those issues. You sought leave to a man in connection with that? Excuse me? Did you seek leave to a man in connection with that? Yes, yes. And, in fact, at the end, the procedural history about this particular issue was a little confusing. What happened was— It sounds like I hear you say, did you want leave to a man in connection with an aiding and abetting claim? Well, we wanted leave—no, we wanted leave to a man to do— we thought that aiding and abetting was a theory within the original complaint, but we wanted leave to a man to plead more specifically the allegations that would have satisfied Kiobel. And I think what happened here, just from the way things happened— And that leave to a man was denied. That leave to a man was— That's one of the things you're appealing. Right, and the reason we're— So what are you contending you would add, given an opportunity to amend that hasn't already been considered by the district court? Well, the district court didn't consider any possible future amendments. What it considered was whether the summary judgment record, where he had found that we surmounted summary judgment, also would have allowed for displacing the Kiobel presumption, which is backwards. I mean, we should have been allowed to allege, for example, that U.S.-based managers had control and supervision over the labor flow. They knew about trafficking. They did nothing to stop it. That that makes KBR directly liable for the traffic that occurred there. That this is all U.S.-based conduct, based in Houston and other places. That you have the kind of financial transactions that were found, even under the narrowest test, which is Balintulo, in the Second Circuit, and Mostafa. There, the Second Circuit found that if there are substantial financial transactions which are alleged to have caused human rights violations abroad, that meets, in part at least, the Kiobel test. That claim failed because they weren't able to establish that those facts established the claim. But we surmounted summary . . . You conducted your discovery prior to Kiobel. Excuse me? You conducted your discovery prior to Kiobel. Well, in fact, we were in the middle of discovery. I mean, we actually opposed summary judgment and prevailed before discovery was closed. So, in terms of timing . . . And the judge didn't say that our request was untimely. He said it was futile. And he said it was futile, we believe, because he misinterpreted the law with respect to Kiobel in a variety of ways. And we actually believe we can beat any post-Kiobel test. There are at least three, possibly four of them. I mean, the circuits are split on this. At some point, the Supreme Court is going to have to decide what it meant by the touch-and-concern test. Because it said there was this test, but it gave absolutely no guidance about what it was. And, in particular, it never gave any guidance about what you do when a U.S. corporation is involved. Because Kiobel didn't have anything to do with that. And the ATS is about U.S. responsibility for law of nations violations. U.S. citizenship matters. U.S. acts matter. The country was concerned in 1789 about not allowing aliens to have a place where they could get a remedy when we were responsible for international law violations. So what we request is that the circuit follow Alshamari, which is the Fourth Circuit test, which is really the only one that has even remotely similar facts. Alshamari is also about a U.S. contractor. So what we're really saying is that even if this Court didn't want to decide ultimately what the touch-and-concern test meant, to choose between the Second Circuit or the Ninth Circuit or the other circuits, this is an easy case. This is the case where there's so much U.S. connection that under any test that's likely to emerge, including all of the ones that now exist, we can plead a complaint that satisfies all those tests. And we should be allowed to do that. We didn't want the U.S.-based conduct because we weren't – no one was focusing on this. The presumption against extraterritoriality was not in any of the cases. What relief do you seek from a higher police? Well, the relief specifically that we want is we would like this Court to reverse the district court and allow us to amend our pleadings to state the facts and circumstances about U.S.-based conduct that would allow us to survive under Kiobel, to state the claim with respect to aiding and abetting more clearly, if that's what's required for the judge to rule on it, and to allow – to request of the judge to complete our discovery. And then the judge will no doubt hear a summary judgment from KBR on those issues. And then this Court would have a full and complete record based on full discovery to decide whether that meets the test or not. And hopefully by that time the Supreme Court will have decided what the test is, and it'll be a lot easier for everybody to do it. Because Judge Ellison was operating in the dark in 2013, and he was operating to some degree in the dark later. I mean, these cases are emerging. They're going on all over the country. And because there's no guidance, there are different views about this. But if you look at the Eleventh Circuit, we meet that test, the Drummond test. You look at Al-Shamar, we clearly meet that. We have much more compelling facts than the Fourth Circuit in there. And I think we meet even the Second Circuit test, which applies the Alito view, which only has two justices in favor of it. Because we have facts that would constitute direct liability occurring in this country. And so our request specifically is to be allowed to amend our complaint so that Judge Ellison can review the complaint, hopefully with some guidance from this Court about what this Court's decision is about what the touch and concern test means. And our view is that Al-Shamari, the way it went about it, is the most faithful both to the Alien Tort Statute and its original intent to make sure that our responsibility for law of nations violations is fulfilled in a federal court and to Kiobel itself, which didn't decide U.S. citizenship. Thank you, Mr. Hoffman. Your time has expired. Sorry, I've gone over. Mr. Harrison. May it please the Court. Let's discuss the TVPRA and then the ATS, please. First, the TVPRA did not say in Section 1596, the 2008 Amendment, that it was clarifying. It did not say that Congress intended it to apply retroactively. Congress was well aware of the well-established and time-honored presumption against retroactive application of statutes. Was it passed in reaction to some court decisions? I don't think so, and certainly the statute does not say so. There have been a number of court decisions since the TVPRA was initially enacted as the TVPA in 2000 and amended in 2003, 2005, and 2008. What was the congressional purpose, as you see it, in the amendment? There were a number of amendments made in the 2008 Amendment, including providing for a jury trial. So it's not at all clear that it was designed for any particular purpose. We do, of course, know this about Section 1596, and that is the purpose of 1596 was to substantively alter the statute to provide for extraterritorial application. That much we certainly know, because the statute says so. Beyond that, it's speculation about what the particular motivations were. We also know from the Landgraf opinion by the Supreme Court What were they striking at by providing for extraterritorial reach? I believe that the intent of the Section 1596 Amendment in December 2008, of course, was to reach trafficking outside of the U.S. Before that, trafficking had to occur into or within the United States. So what was the purpose? The purpose was . . . If this statute is applied retroactively, does the plaintiff have a claim under that? If the statute is applied retroactively, sure. I think that they would have a claim. We would then need to analyze their elements and whether they meet the standard. But, yes, if contrary to Landgraf and contrary to Hughes-Aircraft, the statute applied retroactively . . . Territorial reach is the threshold question across all the statutes? Extraterritorial reach is certainly a question that applies to both. It's a slightly different question in analysis, though, interestingly, under the two statutes. And we'll talk about that when we talk about the ATS. But here on the TVPRA, what we confront is not some amorphous application of common law, but rather whether a particular congressional enactment should apply in a way that Congress did not state. Congress certainly could have and has in many other situations. What's the substantive content of the amendment? The substantive content is considerable, Your Honor. The elements of the claim are different than the state law claim. There are only three state law claims that the plaintiff has pled. We don't have to guess. Negligence, negligent supervision, and negligent hiring. Those claims do not give rise, for example, to punitive damages. The Ninth and Tenth Circuits have held that punitive damages are available under the TVPRA. That is one large difference. The TVPRA is intended to be broad. The language is quite broad, far more broad than a negligent supervision or hiring case. It is not the same elements. What new substantive right did it create? It is a deprivation of rights under Landgraf and under Hughes Aircraft that creates the substantive change before December 2008's 1596 amendment. KBR had an absolute defense of extraterritoriality. The statute does not apply. After the amendment, that is a change. Your Honor's analysis — But you said that means the statute does not apply. Doesn't that just mean the statute doesn't allow that you can reach the same conduct that would apply if I committed it in the United States? Isn't that what that means? If there was trafficking in the United States, yes, the statute certainly would reach that preamendment. Preamendment, however, does not reach the conduct at issue here. So the statute applies to the conduct. We're just talking about the reach of the statute with the 2008 amendment, aren't we? But not exactly. But we have guidance on this from Hughes Aircraft, a unanimous decision from the Supreme Court in 1997, where the court explained that the elimination of a defense previously had is a substantive change that violates the retroactivity presumption. But in Hughes Aircraft, weren't we talking about a substantive defense? Is that the Keaton case? It is, Your Honor. And there, plaintiffs could — Then we were talking about information having been previously given to the government. Exactly. And there, plaintiffs could bring a Keaton case, but it would be thrown out — But here, what you're saying is before 2008, the defense is — we can assume argument, though, that I did everything you say I did. You just can't reach over here and get me for doing it. That's your defense, right? That is certainly one of the defenses and the one that we are talking about. That's a substantive defense in your view. Of course it is, because under Hughes, KBR is entitled to dismissal under 12b-6, no claim for extraterritorial conduct preamendment. In Hughes, the defendant was entitled to dismiss the Keaton case on the merits because of a defense it had, prior disclosure to the government. Likewise, Hughes explained that essentially that change in deprivation of the cause of action created a new cause of action and broadened the range of potential plaintiffs, which certainly 1596 does here. But this amendment doesn't create a new cause of action, does it? I think that it does. Under the language of Hughes, which was not create a new cause of action, but essentially create a new cause of action. The reason is that an absolute defense was removed from those claims. Here, there is no cause of action preamendment for extraterritorial trafficking and forced labor. There is no such claim. It would be dismissed. There is no cause of action. Why? Because it was beyond the reach of the statute. The statute does not proceed. It's illogical. The question of whether you're going to be retrospective or not is in effect substantive rights. And if you say that the substantive rights are effective because you're not liable and you can be reached, then there can be no retrospective application of the statute. I think that's the right thinking on the subject, Your Honor. But there is, as a matter of merit under 12b-6, as Morrison teaches us, to ask what conduct is reached is a merits question. The question of tribunal is a different question. And here— That's a different argument. What you're arguing is that in this context, that to subject the reach of the laws is itself substantive. Are you saying that or not? Yes. In this context, yes, as in Hughes. Did this statute create new remedies? This statute does create remedies that were not available under a different prosecution, like, for example, a state case or an Iraq case. But is it non-availability because of the reach of the statute or did it internally create additional relief? What I'm trying to be clear about is I listened to the argument as you were articulating it a moment ago. It sounded to me that you were simply saying that inherent in extending the reach of laws which have substantive content, that you are creating substantive rights that themselves negate the retrospective application of the statute. And I thought that simply—I started with the premise that if a statute does no more than simply extend without any change of the law itself, but extends the reach of that law, that that doesn't answer the question of whether it is retrospective. I think this is Hughes Aircraft. That same question can be asked of Hughes Aircraft, Your Honor. Because there, there was no change in the remedies available, but rather what conduct is subject to the cause of action. Here, we have that situation. You say Hughes Aircraft is such that basically the extension of its territoriality will never be retrospective. It's hard to imagine a case where—well, if Congress expressly stated as required under Landgraf and INS v. St. Cyr in a long line of cases that it intended the amendment to apply to pre-enactment conduct or pending cases, then of course that's a different question and would satisfy the concern. Absent that, no. Why wouldn't it be exactly the opposite, that unless they intend to create something more, if they're silent with regard to the creation, that it would not—unless the statute affirmatively creates more rights, then it doesn't. I mean, I don't— I think— Your left—it sounds very much like the simple extension of laws. Move away from this for a moment to these trafficking statutes and think in terms, for example, suppose that Congress were to extend Section 4 of the Clayton Act, which enforces the Sherman Act, to extraterritorial conduct. Straight away. And the question would be retrospective. Your argument would be, well, that that cannot be applied to conduct, anti-competitive conduct that preceded that statute. Because now if people are liable, can be—you're now—all you've done, inherent in extending the reach of it, you've affected a substantive result. I don't think that's quite right. I don't either. No, no. But I think that we get guidance from the Supreme Court on this point. I'm trying to understand. I'm having a little trouble tracking you. Let me go at it a different way. I think it may be that those are my questions. What is it about this amendment that created a new right beyond the fact that it extends the reach of the statute to conduct—to where conduct occurs? In other words, the conduct going out there, it has—it's illegal under—it's illegal, period, and for whatever reason. And then the—but you can't, under that statute, reach that conduct. Congress says, OK, we've reached that conduct now. Because we look to the retroactive effect, and under Hughes and under Morrison, the 1596 Amendment expands the class of plaintiffs who may sue, expands the reach of the statute, which under Morrison is a merits question and a substantive change to a new group of people beyond— Extends it beyond—extends it in the sense of liability or extends it in terms of the reaching conduct? Well, both. It did—I think that certainly in terms of civil remedy, it did not exist before the statute, which, by the way, under Landgraf and Hughes is a substantive change, is retroactive effect that's impermissible. It means you cannot do this without clear congressional intent, which we did not have. I think that's the analysis. The question that we're trying to get is, you say it creates a new class of plaintiffs and new remedies. Are there new claims beyond just the fact that now you're outside the United States, or is it just the same thing you could have brought in the United States that now you can bring outside the United States? Are there actually a new group of plaintiffs now or new remedies and new claims that did not exist if you could bring—if it happened in the United States? That's exactly right. All claims would be brought in United States court, but here with the 1596 Amendment, now there's a big change, a whole new worldwide group of plaintiffs who didn't have rights before. Second, a whole new claim. They did not have a TVPRA claim to make and could not have brought one, or if they did, it would be thrown out on 12b-6. That is a sea change, to use Judge Higginbotham's language in Landgraf in 1992. It is a fundamental change. But are they the same identical claims they could have brought if it was in the United States? The claim would be thrown out pre-December 2008, and now it would not on extraterritorial grounds. On the ATS, Heobel and Sosa instruct judicial caution, great caution, and vigilant doorkeeping in considering whether claims may be brought under the ATS. In Aramco, Sosa, and Morrison, the Supreme Court affirmed the longstanding presumption against applying statutes extraterritorially. And importantly, Heobel, in its Section 4, touched and concerned the territory of the United States with sufficient force to overcome the presumption language. The language on which plaintiffs try to rely gives one citation to the Supreme Court's decision in Morrison and the focus and location of the conduct test and tells us this. In Morrison, it is a rare case of prohibited extraterritorial application that lacks all contact with the United States territory. Then we have Justice Scalia's craven watchdog language. Great language, but it's telling, and that is simply to allege some U.S. or domestic conduct is not enough. That's why the Second Circuit's implementation of Heobel in Ballantulo and Mustafa is very interesting because what it tells us is exactly what Heobel and Morrison indicate. And that is it must be the same conduct that constitutes the alleged violation that takes place in the United States. And the plaintiffs do not have that, did not allege it, and cannot. And this is a fundamental problem with the plaintiffs' request that this Court find Judge Ellison abused his discretion in denying leave to amend and a fundamental problem with plaintiffs' argument on the merits. And that is we're not here on a motion to dismiss the ATS claim. Judge Ellison reviewed the summary judgment evidence, volumes of it, and found three different times in very clear language, I'll just read the one, all relevant conduct by Dawood and KBR occurred outside the U.S. It is foreign conduct that is at issue here. That's where the alleged trafficking and the alleged forced labor took place. Plaintiffs, though, try to argue, Judge Prado, again, I think you— Does it matter that it's foreign conduct but it's a product of domestic corporate policy? Absolutely. It matters in this sense. That is not enough. And the Supreme Court, again, gives us clear guidance on this point. Well, suppose the CEO says, we're looking at the bottom line here. There's cheap labor there. Look, we're not trying to write the morals over there. Let's go with it. You know, in this case, we don't have— That's just to test the principle. I don't suggest that happened. But if that did, then it's not—if the conduct is being directed from the states, so to speak, why isn't that enough? Yeah. If I could, I think there's some guidance from the Supreme Court on this point, Your Honor. The first case is Aramco. That case tells us with a U.S. citizen—it's a Title VII case—a U.S. citizen hired in the U.S. signing a U.S. domestic employment contract with a U.S. employer, that is not enough. Aramco tells us that. Morrison tells us, with misrepresentations in a securities trade made in the U.S. in Florida, but the trade in Australia, that is not enough. Here we have, at best, the district court saying that the link to KBR is conjectural yet. So we look for guidance then to other cases, perhaps outside the Supreme Court, to answer Judge Higginbotham's question. The plaintiffs ask us to look to Al-Shamari. Well, if we did, that wouldn't be close to enough for various reasons. First, in Al-Shamari, the United States managers were alleged—it's a motion to dismiss, not evidence case— were alleged to have encouraged the specific wrong at issue, the torture at Abu Ghraib. That is not even alleged here, and Judge Ellison rejects that on the evidentiary record. Second, there was daily contact with the U.S. to implement that sort of oversight, alleged in Al-Shamari. Not alleged here. The closest that the plaintiffs try to make is some argument about a failure to investigate a consultant and a Marine's claims. And if I could urge the court to please read Judge Ellison's opinion. In the record excerpt 219 and note 4, Judge Ellison dispels that and dispels something we see in the plaintiff's brief about KBR's supposed knowledge, making clear that is not U.S. knowledge. To continue, though, Judge Higginbotham. You're basically saying that naked, vicarious liability will not carry the day. That there has to have been an affirmative affirmation or encouragement of the particular conduct. Absolutely. And we've heard that from the plaintiffs here. They're claiming a direct case. But further, if we think about the incentives in the actual situation, in this case if we could, here KBR has Log Cap 3. It's a cost plus reimbursement contract. There's no incentive to try to supply labor on the cheap. There's an incentive to supply labor to support our troops. And the way KBR went about that was it subcontracted with the real target in this case, Daoud, the Jordanian company. And there is in the record at site 34264 a February 2004 contract between KBR and Daoud where, contrary to plaintiff's suggestion of control over the means of implementation, it provides that Daoud is solely responsible for safe legal and international transit in compliance with the national and military regulations. So the subs are violating their contract or not? I'm sorry? Engaging in this conduct are the subs violating the contract up the line? You said that you're talking about the subs here. The answer to that question, I've got to say, I think is the plaintiffs have not on the merits established their claims. Look at Buddy Garung's testimony that we feature in our briefs at pages 6 to 8. It flatly undercuts the plaintiff's allegations, which is why deferring to Judge Ellison, who reviewed the record and the actual evidence, supplants plaintiff's suggestions of allegations. One last point, if I could, Judge Graves, on your question about the leave to amend. The standard is abuse of discretion. And I think that is important where we are looking at not just a motion to dismiss, but an evidentiary record reviewed by a judge who showed himself to be meticulous and sympathetic to the plaintiffs in this case. And to credit his finding, especially in a case where, like Whittaker v. City of Houston, out of this court, the plaintiffs expressly stood on the sufficiency of their pleadings at summary judgment and did not ask for leave to amend until 16 months after Keoghle and over a year after the ATS claim was thrown out. This court should affirm. Just three very quick things. One is that— No, don't make them quick. And I'll try to make them slowly. And one is that Mr. Harrison's argument on the retroactivity only makes sense if you look solely at the TVPRA itself. But that isn't what the Supreme Court does, and that isn't what the circuit courts have done. It's very clear from Bradley and from Pete's auto is that you don't look at the statute that's been changed to determine whether there's a retroactive effect. Otherwise, that's totally circular. You can look at the common law and other laws, and that's what the Supreme Court did in Bradley, and that's what it emphasized in Martin v. Haddix and Landgraf, and that's what the Fourth Circuit did recently in the Pete's auto case when they looked at the availability of the same relief under the common law, and that that plaintiff would have been able to enforce the same rights under common law as under the new statutory cause of action there. So that entire argument falls away if you look at the way that courts have traditionally interpreted the Landgraf question. Secondly, with regards to magic words, we wouldn't need the Landgraf test, right? If Congress always said it meant for statutes to apply retroactively, we wouldn't need Landgraf because Landgraf only kicks in when Congress hasn't been clear, when there isn't. Then you wouldn't have to go through this whole step of whether or not it has a retroactive effect because Congress would have told you. The whole reason we have this long line of cases is because Congress is occasionally insufficiently clear, and I say that with some regret because I spent eight years on the House Judiciary Committee, so it's probably sometimes my fault. And the same is true of clarifying amendments. In fact, courts have expressed some suspicion when there are magic words because it's very easy to put in clarifying when, in fact, that's not what you're doing, which is why courts emphasize what the action was taken and whether it was a response to a contrary decision. And then with regard to the facts that Mr. Harrison raised at the end, I just wanted to end with that the court ruled on summary judgment that each of the plaintiffs had shown, had presented sufficient evidence to show that they were a victim of human trafficking and coercion, that KBR's conduct was knowing, and most significantly that KBR had the authority to exercise control and did exercise control over the recruitment and supply of the laborers in this case, and KBR did not appeal that ruling, and that ruling is in the record. Thank you, Your Honor. Very briefly, Your Honor, Mr. Harrison has focused on the summary judgment record. I think it's important for the court to focus on the fact that the summary judgment papers, the record was prepared prior to Kiobel. There was no presumption against extraterritoriality argument ever made in the case prior to the summary judgment briefing where all the evidence was put together and prior and the discovery was taken up until that point. In fact, in 33 years of alien tort statute litigation, there had never been a case that had used the presumption against extraterritoriality. So Kiobel broke new ground. When there was an additional summary judgment motion based on Kiobel, Judge Ellison, without a hearing, decided that all extraterritorial claims were out. We brought a motion for reconsideration because there were then all these new cases, Alshamari, other cases, that showed that there was a different analysis under the Touch and Concern case, and we asked in the context of that for an ability to amend so that we could add allegations that showed U.S.-based conduct that would establish liability under the Second Circuit test or even additional allegations that would satisfy Alshamari, which we think is the most appropriate way to interpret Kiobel. But anywhere along that spectrum, we can add allegations that fit any of the tests. And we also would take additional discovery. This is not a case where we're dealing with Iqbal. We already have survived the summary judgment motion. It's clear we've got plausible claims. So there's no reason not to allow us to get to that discovery to show that the U.S.-based conduct would satisfy any of these tests. And that's why the judge made an error in finding that it was futile, because he looked at a summary judgment record that had absolutely nothing to do with Kiobel, and he looked at that to see if we could meet the test, not to the allegations that we would make that would be specifically directed to our Kiobel responsibilities. Thank you, Your Honor. Thank you. That completes our docket for today.